### UNITED STATES DISTRICT COURT FOR THE
### DISTRICT OF NEW HAMPSHIRE

<u>Donald Whitten</u>


     v.                                      Civil No. 09-cv-450-SM

<u>Larry Blaisdell, Warden,</u>
<u>Northern New Hampshire</u>
<u>Correctional Facility et al.</u>[1]


### REPORT AND RECOMMENDATION

     Before the court is plaintiff Donald Whitten's motion for a preliminary injunction, set forth as a request in his complaint (doc. no. 1).  Plaintiff's request arises from his claims that he has been denied adequate medical care while incarcerated, in violation of his Eighth Amendment rights.  The preliminary injunction motion was referred to me for a hearing, proposed findings, and recommendations.  The parties appeared for an evidentiary hearing on February 17, 2010.  At the conclusion of

---

[1]In addition to Larry Blaisdell, Northern New Hampshire Correctional Facility Warden, the complaint names the following defendants:  William Wrenn, New Hampshire Department of Corrections ("DOC") Commissioner; Robert MacLeod, DOC Medical Director; Dr. Celia Englander, DOC physician; Dr. Eppolito, DOC physician; and Judy Baker, DOC Nurse Practitioner.  In accordance with an order issued this date granting a request for voluntary nonsuit as to Dr. Eppolito, Eppolito is no longer a defendant in this case.

the hearing, on cross-examination and in response to questions
from the Bench, Whitten testified that since he filed his lawsuit
in December 2009, "everything has been taken care of," including
his heart condition and pain issues.  As explained more fully
below, I recommend that the motion be denied at this time,
without prejudice to renew if circumstances change relating to
the prison's provision of constitutionally adequate medical care.

**Background**

Whitten is a 61-year old inmate at the Northern New
Hampshire Correctional Facility in Berlin, New Hampshire.
Whitten has endured lower back pain and neck pain for many years.
Whitten had an operation in Connecticut on two cervical discs
several months before his incarceration.  Whitten has a history
of high blood pressure.  Since entering prison in 2008, Whitten
has also been diagnosed with congestive heart failure ("CHF").
Whitten is on a regimen of approximately twelve different
medications for his health problems, including Vicodin for back
pain and Lasix, a diuretic, for his CHF.

Defendant Judy Baker, a nurse practitioner, is the health
care provider on the prison staff responsible for Whitten's
primary care in Berlin, along with defendant Dr. Celia Englander,

a physician.  Dr. Eppolito -- named as a defendant but dropped per Whitten's request in an Order issued this date -- has prescribed treatment for Whitten's back and neck pain since September 2009, in connection with the prison's pain management clinic.

I.   Back and Neck Pain

Many years ago, Whitten suffered a back injury.  Shortly before entering the prison in August 2008, Whitten had surgery in Connecticut to repair two cervical discs.  He entered prison with a list of prescriptions, including pain medication.  Beginning in August 2008, prison medical staff prescribed Vicodin for Whitten, in lieu of the pain medication he had taken previously.  Def. Ex. A at 3, 211.  Vicodin is an opioid prescribed to control pain.

Whitten testified that his Vicodin prescription has gone up and down during the course of his incarceration, not always in response to his complaints about pain.  Whitten's medical records show that he has complained about chronic back pain since his intake in the prison in August 2008, and that he has told the prison medical staff a number of times that Vicodin is sometimes effective for pain relief.  See, e.g., Def. Ex. A at 6, 11, 348; Def. Ex. C.  Specifically, in April 2009, Whitten filed an inmate

request slip asking defendant Judy Baker to explain why his
Vicodin dosage was reduced.  Baker replied that the "Admin.
Staff," including Dr. Englander, had told her to taper off his
medications and order him seen by the prison pain clinic, which
she said that she did.  Whitten filed a request slip with
Englander asking for a pain clinic evaluation as soon as possible
thereafter.  A nurse responded that Dr. Eppolito was the pain
clinic doctor.  Def. Ex. A at 348-49.  Whitten followed up on May
10, 2009, by sending a request to Robert MacLeod, DOC medical
director, describing his condition and the course of his
treatment in detail.  The request ends with the following appeal:
"Ethically I cannot be left in this state of severe pain."
Whitten received a reply on May 29, 2009, noting that Indocin, a
pain medication, had been prescribed for him and that he should
go to sick call with any further concerns.  Def. Ex. A at 350.
In the meantime, on May 20, 2009, Whitten sent a request to Dr.
Eppolito, requesting help.  His request was redirected to a nurse
case manager who replied that the pain clinic had not yet started
in Berlin, and that pain medications were ordered for him on June
1, 2009, and that he should go to sick call with further
problems.  Def. Ex. A at 353.  Nurses at sick call directed

4

Whitten to take Tylenol or Motrin, but he replied that these nonprescription medications do not help him.  The progress notes for Whitten taken at sick call include his frequent complaints about severe back and neck pain from May 2009 through August 2009.  See, e.g., Def. Ex. A at 21-34.

The prison medical records show that Whitten's Vicodin dose fluctuated over time.  For several weeks beginning on April 24, 2009, Whitten's Vicodin dose was tapered down from two tablets four times a day towards discontinuation of the drug.  From May 6 until May 22, 2009, Whitten received only one Vicodin daily, one eighth the dosage he received at the beginning of the taper, and no other medications for pain, leaving him in "a constant and consistent state of severe pain."  Def. Ex. A at 350; see also Def. Ex. B.  Baker prescribed Indocin for Whitten's pain on May 22, 2009, then ordered Vicodin again on May 26, and increased the dosage in June 2009.

Dr. Eppolito met with Whitten on July 7, 2009, and directed that Whitten's Vicodin prescription be tapered off again over a period of several weeks.  See Def. Ex. A at 27, 355, 362; Def. Ex. B.  Eppolito noted his concern that Vicodin contains acetaminophen, which can have an impact on liver function over

5

the long term.  See Def. Ex. A at 27.  Whitten objected.  From July through September 2009, Whitten complained a number of times about the lowered dose of Vicodin and severe pain.  See Def. Ex. A at 355-76.

Beginning in August 2009 through December 2009, Whitten was seen five times by a physical therapist.  Dr. Eppolito and the prison's pain clinic began treating Whitten for pain in September 2009.  Whitten testified that his complaints about back and neck pain have been addressed since September or October 2009.  With the exception of April/May 2009, during all times of reduced Vicodin dosages (including August to December 2009), Whitten received other drugs for pain, including Mobic, Motrin, Excedrin Migraine, Ultram, and MS Contin, in combination with or in lieu of the lower dose of Vicodin.  See Def. Ex. B.

In connection with Eppolito's plan for Whitten, which was put in place in September 2009, MRIs of Whitten's spine were taken in September 2009 and additionally in November 2009.  In November 2009, Whitten was referred to Dartmouth Hitchcock Medical Center ("DHMC") for further evaluation of his back pain. The consulting physician's recommendations included maintaining the current regimen of medications, starting epidural steroid

injections, and possibly proceeding with medial branch blocks, radio-frequency ablation, or a neurosurgical consultation.  See Def. Ex. A at 288 and 295.

Dr. Eppolito ordered Whitten's Vicodin prescription discontinued over the next two weeks, beginning January 21, 2010, and increased the dose of MS Contin during the same time period. See id. at 111-12.  The prison sent Whitten to DHMC for a steroid injection on February 8, 2010.  Whitten reported to prison medical staff on February 15, 2010 that his pain remained severe after the steroid injection, and that MS Contin was not as effective as Vicodin.  On February 16, 2010, Baker increased the dosage on Whitten's Vicodin prescription to two tablets twice a day and specifically arranged for Whitten to receive the medication as necessary at the courthouse the next day.  Whitten was scheduled for a follow-up appointment with Dr. Eppolito on February 25, 2010 to address his pain issues.  See Def. Ex. C.

    B.   Heart Problems, Leg/Abdominal Swelling, and Chest Pain

Whitten was diagnosed with mild CHF while in prison. Symptoms of CHF may include weight gain and swelling in the legs or abdomen, as the heart no longer pumps blood as effectively, and fluid is retained in the body.  Diuretics, including Lasix,

may be prescribed to eliminate excess fluid.  CHF is a chronic condition that may be affected by diet and medication, but for which there is no cure.

In September 2008, Whitten came to sick call with swollen ankles.  At that time, the nurse noted his history of high blood pressure, suggested a need for Lasix, and scheduled him for a follow up appointment with a nurse practitioner.  Def. Ex. A at 6.  A medication for high blood pressure with a diuretic effect, hydrochlorothiazide ("HCTZ"), was prescribed for Whitten in September 2008.  See id.  In October 2008, Whitten complained of chest pain, and the prison sent him out for a chest x-ray and electrocardiogram (ECG).  Def. Ex. A at 73.  Whitten gained fifty pounds in four months, from August to December 2008.  Def. Ex. A at 9.

Whitten started taking Lasix, by prescription, on December 15, 2008, after he came to sick call with swollen ankles and a swollen abdomen.  Id. at 11, 75.  His Lasix prescription was increased on December 24, December 30, and January 5, 2009.  Id. On January 6, 2009, Whitten was sent to the Androscoggin Valley Hospital emergency department for an evaluation.  He was diagnosed at that time with mild CHF, and his treatment plan

8

included a "strict no added salt diet," resting with elevated legs, continuing Lasix at a lower dose, discontinuing HCTZ, changes to other medications, and reevaluation for any increased shortness of breath or chest pressure.  The physician also noted that Whitten may benefit from an echocardiogram in the near future and support stockings.  Def. Ex. A at 227-28.  Whitten underwent an echocardiogram on January 15, 2009.

Whitten's progress notes for January 2009 through March 2009 indicate that Whitten continued to have swelling in his legs. Def. Ex. A at 14-18.  Notes taken on February 4, 2009 describe the results of an echocardiogram taken in January 2009 and direct an increase in Whitten's heart medication (lisinopril) and Lasix. Id. at 15-16.  Support stockings were given to Whitten on March 30, 2009, but Whitten did not always wear them in accordance with his treatment plan.  See Def. Ex. A at 17, 19.

In September 2009, Whitten told the medical staff that he wanted to receive all of his medications at his "red med" visits. See Def. Ex. A at 36, 38.  "Red meds" are certain prescription medications that inmates cannot keep in their own possession, but may only take at the medical department under supervision.

Whitten's Lasix prescription was increased in early

9

September 2009 and again in October 2009.  Def. Ex. A at 90, 95.
On September 17, 2009, Eppolito ordered a cardiology consultation
and an echocardiogram for Whitten "ASAP," along with weekly
weighings.  <u>See</u> Def. Ex. A at 38, 92.  A diet consultation was
ordered in October 2009 to evaluate Whitten's excessive weight
gain.  Def. Ex. A at 96.

The nutritionist performing the assessment in November 2009
noted Whitten's weight gain, history of hypertension and
metabolic syndrome, and his eating salty foods from the canteen.
The nutritionist recommended that Whitten continue to be provided
with a "regular" diet.  <u>See</u> Def. Ex. A.

Whitten's lab reports from July 2009 through November 5,
2009, showed abnormal results for factors that can be related to
impaired kidney or heart function.  <u>See</u> Def. Ex. A at 134.  On
November 30, 2009, Whitten appeared at sick call complaining of
swelling in his lower legs and shortness of breath.  <u>Id.</u> at 48-
49.  Whitten returned for a follow-up appointment on December 4,
2009.  He said that his breathing was better, and that he felt
short of breath only with exertion.  He lost seven pounds in the
four days from November 30 to December 4, from 244 to 237.  Dr.
Eppolito's orders written after a December 17, 2009 appointment

include the following statement, in addition to several words that are not clear: "NO leg . . . edema." Def. Ex. A at 107. Whitten's Lasix prescription remained constant from November 13, 2009 through December 2009. See id. at 95, 106, 496, 503, 505.

On January 3, 2010, Whitten came to his red meds visit at 9:20 p.m. feeling dizzy and thirsty, as if he had low blood pressure. The nurse noted that Whitten's mouth was dry, and that the tops of Whitten's hands showed "tenting," all signs of dehydration. After taking his blood pressure and finding it to be in the normal range (98/76), the nurse told Whitten to "listen to his body" and increase his fluid intake. The nurse gave him three full glasses of water to drink during the visit. The nurse indicated in his plan of care that Whitten should increase his fluid intake to prevent dehydration and access sick call if his signs and symptoms did not improve. The nurse noted a "Knowledge Deficit R/T proper hydration/fluid intake." Def. Ex. A at 51.

Whitten returned to sick call on January 6, 2010 and collapsed. He later told the staff that he was there because he was feeling weak and dizzy. Whitten's blood pressure was low (80/40). The prison sent him by ambulance to the emergency department at Androscoggin Valley Hospital. The emergency room

11

physician noted signs of prerenal kidney failure, possibly secondary to his medications, and recorded that Whitten was not eating or drinking well.  Def. Ex. A at 302.  Whitten was admitted through the emergency department and discharged two days later with diagnoses including prerenal kidney failure, secondary to dehydration.  Def. Ex. A at 316.  An echocardiogram performed during the hospitalization was normal.  See id. at 531.  The discharge recommendations included changing Whitten's lisinopril prescription, reducing the Lasix, changing other medications, following a "no added salt diet," and monitoring Whitten's weight and blood pressure three times weekly.  Def. Ex. A at 316-17.  Whitten testified that a nurse told him after he returned to the prison that his medications were not adjusted properly, that they were not helping him, and that this had almost caused him to lose a kidney.

On February 3, 2010, Whitten was admitted to the infirmary after complaining about chest pain and shortness of breath for several days during his red meds visits.  Def. Ex. A at 65-66.  The admitting provider's notes include an order for a "low salt, cardiac diet," daily weight checks for two weeks, and two series of blood tests for certain metabolic factors in the coming week.

12

See id. at 114.

On February 4, 2010, the prison sent Whitten to the Androscoggin Valley Hospital emergency room for an evaluation of the chest pain that he had complained about for several months. See Def. Ex. A at 528.  On admission, the emergency room physician noted that Whitten had a poor diet, "eats a lot of ramen noodles which contain a lot of salt," and continued to have swelling in his legs.  Id. at 529-30.  A stress test was performed, and the physician interpreting the results concluded that Whitten's pain was most likely noncardiac.  Whitten was discharged with diagnoses including chest pain "with a negative cardiac workup."  Def. Ex. A at 534.  The discharge instructions dictated on February 5, 2010, included the following recommendations:  continuing on the same medications, following up with the cardiology clinic on an outpatient basis, and having a "noncardiac workup of his chest pain."  Id. at 535.  The prison physician orders for Whitten's discharge date include the note that he resume a regular diet.  See Def. Ex. C.

On February 11, 2010, Whitten was referred outside the prison to a cardiologist for an evaluation of his chest pain. The consulting cardiologist recommended cardiac catheterization.

On February 12, 2010, defendant Judy Baker ordered the procedure scheduled as soon as possible.  <u>See</u> Def. Ex. C.  Whitten testified to his understanding that the prison is planning to have this test done.

As to any issues relating to dehydration since his February 2010 emergency room visit, the progress notes for February 15, 2010 include observations that Whitten's legs were dry without edema, his weight had dropped to 216 lbs., and his hands showed signs of tenting.  <u>See</u> Def. Ex. C; <u>see also</u> Def. Ex. A at 60.  The nurse noted that Whitten attributed some of the weight loss to eating canteen food.  Def. Ex. C.  The nurse told Whitten to increase his fluid intake to avoid dehydration.  <u>See</u> Def. Ex. C; <u>see also</u> Def. Ex. A at 60.  The nurse reviewed Whitten's weight loss, dry skin, and tenting with Dr. Eppolito.  Eppolito lowered the Lasix dose and scheduled laboratory tests for February 16, 2010.  <u>See</u> Def. Ex. C.

## <u>Discussion</u>

A preliminary injunction cannot issue unless the moving party satisfies certain requirements for such relief.  <u>See</u> <u>Ross-Simons of Warwick, Inc. v. Baccarat, Inc.</u>, 102 F.3d 12, 18-19 (1st Cir. 1996) (plaintiff bears burden of proof for preliminary

injunction).  Those requirements are: "(1) a likelihood of success on the merits; (2) irreparable harm to the plaintiff should preliminary relief not be granted; (3) whether the harm to the defendant from granting the preliminary relief exceeds the harm to the plaintiff from denying it; and (4) the effect of the preliminary injunction on the public interest."  Rio Grande Comm. Health Ctr. v. Rullan, 397 F.3d 56, 75 (1st Cir. 2005).

I.    Likelihood of Success on the Merits

    "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  Helling v. McKinney, 509 U.S. 25, 31 (1993); Giroux v. Somerset County, 178 F.3d 28, 31 (1st Cir. 1999).  The Supreme Court has adopted a two-part test for reviewing claims under the Eighth Amendment's cruel and unusual punishment clause.  See Farmer v. Brennan, 511 U.S. 825, 834 (1994).  Jail officials have an obligation under the Eighth Amendment to protect inmates from prison officials acting with "deliberate indifference" to their "serious medical needs."  Id. at 831.  A prisoner must first show that he has not been provided with adequate care for a serious medical need.  See id.; Rhodes v. Chapman, 452 U.S. 337, 347 (1981); Estelle v. Gamble, 429 U.S.

97, 106 (1976).  The inmate must then show that a responsible prison official was aware of the need or the facts from which the need could be inferred and still failed to provide treatment.  See Estelle, 429 U.S. at 106.  "[S]ubstandard care, malpractice, negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of treatment are all insufficient to prove a constitutional violation."  Ruiz-Rosa v. Rullan, 485 F.3d 150, 156 (1st Cir. 2007).

Here, Whitten has established that he has suffered from a number of serious medical needs requiring treatment.  These serious medical needs include heart problems, chronic neck and back pain, and, in January 2010, prerenal kidney failure.  These issues are discussed more fully below.

A.   Heart and Kidneys

Whitten's concern about the prison's treatment of his heart problems centers around his January 2010 admission to the Androscoggin Valley Hospital through the emergency department, and his later learning that misadjustment of his medications could have caused him to lose a kidney.  Although no expert testified at the hearing, the evidence suggests that the prison did not take the steps necessary at that time to prevent Whitten

16

from reaching a state of acute prerenal kidney failure, until he was rushed to the hospital on January 6, 2010.  Whitten's dizziness, dry mouth, thirst, loss of skin turgor, and feeling of low blood pressure flagged a risk of dehydration on January 3, 2010, especially given his Lasix treatment, and the nurse responded by making him drink several glasses of water before leaving.  Certainly, given Whitten's collapse several days later, making him drink water, sending him away with instructions to drink more, and telling him to come to sick call if his symptoms persisted, did not arrest the conditions that gave rise to the risk of dehydration in the first place on January 3.  Presented with similar symptoms on February 15, 2010, Dr. Eppolito lowered Whitten's Lasix dosage immediately and scheduled lab tests for the following morning.  These facts suggest that Whitten may have received substandard care in late December 2009 and early January 2010, when these steps were not taken.  I make no finding in this regard, however, because Whitten has not proven that he will suffer any irreparable harm at this time in the absence of a preliminary injunction, given the prison's present attention to his needs, as explained more fully below.

17

B.   <u>Back Pain</u>

Whitten's claims about his chronic back and neck pain relate primarily to the times prior to October 2009 when his Vicodin prescription was reduced or discontinued.  Whitten testified that since October 2009, his back pain issues have been addressed.

The evidence shows that for several weeks in May 2009, Whitten did not receive sufficient pain medication or treatment to reduce his back pain, which he described as severe and constant.  When he complained to defendant Judy Baker, he was first told that he needed to direct his concerns to others including Dr. Englander.  When he sent a request slip to Dr. Englander, a nurse replied that Dr. Eppolito was the pain clinic doctor.  When he sent a request to Dr. Eppolito or the pain clinic for an immediate evaluation or treatment, a nurse told him the pain clinic was not in operation in the Berlin prison at that time, and that treatment was prescribed for him on June 1, 2009. Weeks passed after he began complaining about pain before supplemental pain medication was prescribed for him.

Nor did Whitten receive adequate pain relief when his Vicodin was tapered in July-September 2009.  At that time, however, the medical staff ordered other medications and physical

18

therapy for Whitten.  The provision of medication and other treatments during those time periods belies any assertion of deliberate indifference for those periods of heightened pain. That approach to Whitten's care contrasts markedly with the failure to treat him with any prescription medication in lieu of a higher dose of Vicodin for several weeks in May 2009.

At this time, I need not make a finding on whether Whitten has shown a likelihood of prevailing on his claim of inadequate treatment of his back and neck pain in the past.  As explained more fully below, Whitten has failed to demonstrate that he will suffer any irreparable harm in the absence of an injunction.

II.   <u>Irreparable Harm</u>

"[A] federal court cannot dispense with the irreparable harm requirement in affording injunctive relief." <u>Gately v. Massachusetts</u>, 2 F.3d 1221, 1232 (1st Cir. 1993).  Whitten has not carried his burden to show that he will suffer irreparable harm in the absence of preliminary injunctive relief for any of his medical problems.  Whitten pointed to no tests, procedures, or treatments that should be ordered at this time that the prison is not providing to him currently or planning to provide in the near future.

19

On cross-examination, and in response to questions from the Bench, Whitten testified that all of his medical concerns are being addressed by the prison at this time.  Whitten specifically testified that his back pain issues have been addressed by the prison since October 2009.  The medical records show that Dr. Eppolito has developed a plan of care for Whitten, and that the prison is carrying out this plan.  Whitten's testimony that the prison began adequately addressing his back pain two months <u>before</u> he filed his lawsuit suggests that the pending lawsuit has not driven his treatment plan, and that adequate care can be expected to continue in response to Whitten's back and neck problems in the future.

The evidence relating to Whitten's heart problems similarly fails to establish a need for preliminary injunction relief to avoid any risk of irreparable harm.  Prison medical providers have prescribed medication for Whitten's heart problems and have sent Whitten outside the prison for diagnostic procedures, consultation, and emergency care.  Whitten has undergone echocardiograms, ECGs, and chest x-rays and scans.  When providers have recommended medication changes or diagnostic tests in the past, prison officials have followed up on these

recommendations.  The longest delay occurred after Dr. Eppolito
ordered an echocardiogram and cardiology consultation in
September 2009; Whitten underwent an echocardiogram on January 6,
2010, had a stress test on February 4, 2010, and met with a
cardiologist on February 11, 2010.  The prison has ordered
cardiac catheterization for Whitten in accordance with the
cardiologist's recommendations.  I find no substantial evidence
to suggest that prison officials will fail to order any necessary
treatment or procedures for Whitten's heart problems in the
future in the absence of court intervention.

     As to any misadjustment of Whitten's medications that may
have occurred in late December 2009 and early January 2010,
Whitten's collapse and emergency room evaluation clearly alerted
prison officials to the risk that his medications and diet could
harm his kidneys if he is not carefully monitored and becomes
dehydrated.  On February 15, 2010, Whitten again showed signs of
dehydration.  This time, the prison medical staff treated his
condition with the degree of urgency that his circumstances
demanded:  Whitten's Lasix prescription was reduced immediately
and follow-up lab tests were scheduled for the next morning.
These factors demonstrate that the prison is attending to

Whitten's medical needs without court intervention at this time. Whitten is not at risk of irreparable harm in the near future in the absence of a preliminary injunction in this regard.[2]

As there is no significant risk of irreparable harm, "that fact alone is dispositive."  EEOC v. Astra U.S.A., Inc., 94 F.3d 738, 746 (1st Cir. 1996).  An analysis of the remaining preliminary injunction factors would be irrelevant.  Therefore, I recommend that the motion for a preliminary injunction be denied. The denial should be without prejudice, so that Whitten may file a motion for a preliminary injunction again during the pendency of this litigation if Whitten can show that he is no longer receiving constitutionally adequate medical care.

_____

[2]While Whitten has not raised the issue, I am troubled that prison officials have ordered a "regular" diet for Whitten. Whitten should avoid salty food.  Whitten's discharge instructions from Androscoggin Valley Hospital in January 2010 included a "no salt added diet" for Whitten, the physician admitting him to the infirmary in February 2010 ordered a low salt diet, and the physician examining him in the emergency department thereafter recommended a low salt diet for him.  See, e.g., Def. Ex. A at 223; 529-30.  As Whitten has not raised any claim regarding the diet ordered for him at the prison, and given Whitten's own testimony that he often makes his own meals out of salty food (like ramen noodles) that he purchases at the canteen, I make no findings at this time regarding whether the provision of a "regular" diet for Whitten violates his right to adequate medical care under the Eighth Amendment.

22

Conclusion

For reasons set forth more fully above, I propose that the district judge enter findings consistent with this report, and I recommend that the motion for a preliminary injunction be denied.

Any objections to this report and recommendation must be filed within fourteen (14) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order. See Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

James R. Muirhead
United States Magistrate Judge

Date: March 15, 2010

cc:  Donald C. Whitten, pro se
     Edward M. Kaplan, Esq.
     Nancy J. Smith, Esq.

JRM:nmd